UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
EDITH CRUZ BONILLA,

                   Plaintiff,                          **REPORT AND**

   -against-                                  **RECOMMENDATION**
                                             20-CV-807 (JMA)(SIL)

ANDREW SAUL,
Commissioner of Social Security,

                   Defendant.
---------------------------------------------------------------X

**STEVEN I. LOCKE, United States Magistrate Judge:**

     Presently before the Court in this Social Security appeal, on referral from the Honorable Joan M. Azrack, are: (i) Plaintiff's Edith Cruz Bonilla ("Plaintiff" or "Bonilla") motion for judgment on the pleadings ("Plaintiff's Motion" or "Pl. Mot"), DE [14], and (ii) Defendant's Commissioner of the Social Security Administration ("Defendant" or the "Commissioner") cross-motion for judgment on the pleadings ("Defendant's Motion" or "Def. Mot."), DE [15]. Both motions are brought pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(c). *See id.*

     By way of Complaint dated February 13, 2020, Plaintiff commenced this action against Defendant pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of the Commissioner's final decision denying her claim for disability insurance benefits. *See* Complaint ("Compl."), DE [1]. On December 4, 2020, the parties filed their cross motions for judgment on the pleadings, and District Judge Azrack referred this case to Magistrate Judge Tomlinson for Report and Recommendation on December 21, 2020. *See* Dec. 21, 2020 Electronic Order. The

case was subsequently assigned to this Court on November 23, 2021. *See* Nov. 23, 2021 Electronic Order. For the reasons discussed herein, the Court respectfully recommends that: (i) Plaintiff's Motion be granted, (ii) Defendant's Motion be denied, and (iii) the matter be remanded for further proceedings.

## I.    BACKGROUND[1]

### A. Non-Medical Evidence

Bonilla was born in La Union, El Salvador in March 1972, and was 43 years old at her alleged disability onset date, November 1, 2015. *See* Tr. 46, 156. Around that time, she began experiencing persistent headaches and was diagnosed with multiple brain aneurysms. *See* Tr. 294-96; 253-55. Plaintiff completed tenth grade but did not finish high school, and she came to the United States in 1991, and is now a naturalized citizen who is able to read and write in English. Tr. 46, 78, 156, 176. Bonilla lives in Suffolk County with her husband and three children ages 13, 14 and 16. Tr. 58. Her prior jobs included working in a warehouse for Ganis Brothers from 1992 to 2001, and her most recent job was a home health aide from January 2008 to December 2015. Tr. 47-49, 79, 158, 176. Plaintiff's earnings and work history in the ten years prior to her alleged onset date show that she has acquired sufficient quarters of coverage to qualify her for Social Security Disability Insurance benefits. Tr. 17.

### B. Medical Evidence

1. <u>Treatment Records</u>

---

[1] Unless otherwise indicated, the facts set forth herein are taken from the Certified Administrative Record ("Tr."), DE [13], and are accepted as true for purposes of the instant motions.

Plaintiff's medical records include emergency department and outpatient records from Stony Brook University Hospital where she was admitted and underwent surgery for her aneurysms. Tr. 247-73. Bonilla also received a psychiatric evaluation by Paul Herman Ph.D. ("Dr. Herman"), Tr. 274-78, and an internal medicine examination by Andrea Pollak, D.O. ("Dr. Pollack") both at the request of the Social Security Administration ("SSA"). Tr. 279-85. Also included are treatment records and reports from several medical providers at: (i) Mid Suffolk Medical Care from November 2015 to October 2018, which is her primary care provider and where she received treatment for her headaches, back pain, asthma, diabetes, and other relevant conditions, Tr. 288-92, 294-445, 596-650; (ii) Long Island Medical Arts from April 2016 to July 2018, where she received neurological treatment for her headaches and back pain, Tr. 293; 446-92; (iii) NY Spine and Brain Surgery from December 2015 to February 2018, where she received treatment for her aneurysms and back pain, Tr. 493-588; and (iv) Medical Arts Radiology from April to June 2017, where she underwent MRIs of her back, Tr. at 589-95.

## 2. Treatment at Stony Brook University Hospital

Plaintiff arrived in at Stony Book University Hospital on December 11, 2015, and an angiogram confirmed a left carotid ophthalmic aneurysm and a right carotid cerebral aneurysm, and she underwent emergency surgery. Tr. 253-54. She also had residual aneurysms which were not treated during the admission. Tr. 254. Bonilla was discharged from the hospital on December 14, 2015 and was prescribed Plavix for the aneurysms. Tr. 254-55.

3.  <u>Treatment at Mid Suffolk Medical Care</u>

On November 24, 2015, Bonilla saw Barbara Cartabuke, PA ("PA Cartabuke") as a new patient at Mid Suffolk Medical Care for complaints of headache and urinary pain and frequency.  Tr. 294.  Her musculoskeletal exam showed no gross deformity, her gait was normal, and she was diagnosed with diabetes, a urinary tract infection and microhematuria.  Tr. 294-95.  Plaintiff returned for a follow-up appointment one week later complaining of headaches and dizziness.  Tr. 297.  She explained that she had a history of migraines but had not experienced one in a few months.  *Id.*  PA Cartabuke prescribed Meclizine for the dizziness and ordered an MRI and EKG.  Tr. 298.  On December 4, 2015, Bonilla saw Mohammed Azaz, MD ("Dr. Azaz") at Mid Suffolk Medical Care and reported that she had pain in her lower extremities and shortness of breath after walking more than three or four blocks.  Tr. 301.  Plaintiff had a follow-up appointment with Dr. Azaz on December 10, 2015 where she explained that she fell when she got up the prior morning, continued to experience headaches and dizziness, had an episode of numbness on the right side of her scalp, and continued to have significant aches and pains in her lower extremities.  Tr. 304-05.  Her MRI came back suggestive of an intracranial aneurysm, and Dr. Azaz sent Bonilla to the emergency room at Stony Brook University Hospital.  Tr. 305.

Bonilla returned to Mid Suffolk Medical Care on December 24 and 31, 2015 and January 5, 2016, where she continued to complain of frequent headaches and associated dizziness but reported some relief by taking Tylenol on a regular schedule.  Tr. 307-16.  PA Cartabuke performed lab work, diagnosed Plaintiff with anemia,

4

hypertension, diabetes, headache, cerebral aneurysm, anxiety and hypernatremia, prescribed Zoloft for the anxiety and referred Bonilla to a neurologist. Tr. 314-16. On February 18, 2016, at her appointment with PA Cartabuke, Plaintiff reported frequent headaches and numbness in her tongue, as well as pain in her leg muscles during the prior two to three weeks. Tr. 320. She was continued on Tylenol and Plavix, started on Celexa for anxiety and ordered an ultrasound and lab work for her leg cramps. Tr. 321. At a follow-up appointment at Mid Suffolk Medical Care on March 3, 2016, Plaintiff complained of ongoing severe headaches and leg pain and that she needed forms completed for her disability application. Tr. 323. PA Cartabuke ordered a CT scan and lab work for her headaches. Tr. 324. Bonilla was continued on Celexa once a day for depression and referred to neurological surgery for further treatment regarding her aneurysm. Tr. 324-25. At a follow-up appointment on March 31, 2016, Plaintiff's headaches and leg pain had improved. Tr. 326. She was taking Topamax for headaches and reported "excellent improvement," and she was continued on Plavix, Topamax, and Celexa and scheduled to return in two months. Tr. 326-28.

On September 16, 2016, Bonilla underwent a cardiac stress test with Dr. Rakesh Patel at Cardiac Comprehensive Care, where she was referred by Dr. Azaz. Tr. 349-51. The treadmill test was normal, poor effort tolerance was noted, and Dr. Patel recommended that she decrease her caloric intake and lose weight. Tr. 349.

At an appointment at Mid Suffolk Medical Care on September 23, 2016, Plaintiff complained of right ear pain, sore throat and cough. Tr. 339. Plaintiff was

referred to bariatric surgery for her diabetes and obesity.  Tr. 340, 343.  She attended the referral appointment on October 17, 2016 with Dr. Nikhilesh Sakar.  Tr. 346-48. Bonilla was 5'1 and 291 pounds resulting in a body mass index of 55, and surgery was recommended.  Tr. 346.

Plaintiff attended a follow-up appointment on December 14, 2016 at Mid Suffolk Medical Care where she complained of persistent fatigue.  Tr. 432.  She was diagnosed with obstructive sleep apnea, but she did not use a CPAP machine because she reported that it was too uncomfortable.  Tr. 438.  Bonilla also had appointments in December of 2016 for left-sided upper quadrant pain where she was diagnosed with acute diverticulitis.  Tr. 432-35.

Plaintiff saw Dr. Azaz on April 17, 2017, complaining of pain behind her right knee and headaches.  Tr. 424.  He noted tenderness in the left calf and pain with anterior drawer tests.  *Id.*  Imaging was ordered, and Bonilla was told to continue Celexa and Topamax.  Tr. 424-25.  An x-ray of Plaintiff's right knee on April 21, 2017 showed mild degenerative changes.  Tr. 589.  She returned to Dr. Azaz on May 13, 2017 with complaints of bilateral numbness in her feet during the prior week that worsened when walking, but got better after rest, and that she needed assistance with her disability paperwork.  Tr. 422.  Plaintiff reported no significant back pain but intermittent pain radiating to the right lower extremity.  *Id.*  She could stand on her toes, squat and get up from a chair.  *Id.*  Dr. Azaz diagnosed bilateral leg paresthesia and ordered MRIs of the lumbar and thoracic spine.  Tr. 423.

On June 4, 2017, Plaintiff received an MRI of the lumbar spine, which showed bulging with broad based herniation at L5-S1 that contacted the left S1 nerve root within the lateral recess.  Tr. 592.  There was mild to moderate left foraminal stenosis and diffuse disc bulging at L4-5 and L3-4.  *Id.*

Plaintiff attended a pre-surgery appointment for another angiogram at Mid Suffolk Medical Care on June 10, 2017.  Tr. 420.  She reported that she could walk about a mile without chest pain or shortness of breath, but her back pain limited her exercise.  *Id.*  She continued to complain of anxiety, and Dr. Azaz prescribed Buspirone.  Tr. 421.

An MRI of the thoracic spine on June 18, 2017 showed disc desiccation, a shallow disc bulge and abnormal signal involving the T11 vertebral body.  Tr. 594.  Bonilla went over the MRI results with Dr. Azaz on June 22, 2017, and she continued to complain of back pain.  Tr. 418.  Dr. Azaz recommended continued use of Topiramate for her headaches and referred her to an orthopedic surgeon.  *Id.*

On August 29 and September 2, 2017, Plaintiff returned to Mid Suffolk Medical Care for frequent and painful urination.  Tr. 414-17.  She was treated and referred to orthopedic surgery for her back lesion.  Tr. 417.

On November 8 and 10, 2017, Bonilla returned to PA Cartabuke for treatment of asthma with congestion and wheezing, as well as back pain.  Tr. 409-11.  She was prescribed Methylprednisolone and Flovent to treat her asthma.  Tr. 411.  On January 16, 2018, Bonilla returned to PA Cartabuke with complaints of a cough and chest congestions and wheezing despite using an inhaler a few times each day, as

7

well as headaches and tiredness.  Tr. 407.  She was diagnosed with an exacerbation of intermittent asthma and prescribed Bactrim, Medrol and Diflucan.  *Id*.  During a follow-up appointment with Dr. Azaz on February 21, 2018, he noted that Bonilla had been inconsistent with her diet and was exercising for 15 minutes in bed.  Tr. 400. They went over her medications, which he continued, and Bonilla noted she saw a urologist and was going to see a neurosurgeon for possible repair of her brain aneurysm.  Tr. 400-04.

On March 16, March 28 and April 6, 2018, Bonilla saw Dr. Azaz for throat pain. Tr. 392-99.  Lab work was performed, and she was diagnosed with morbid obesity and underwent a depression screening.  Tr. 393.  She was referred to therapy for her depression and to a physical therapist for low back pain.  *Id*.  She still reported throat pain at her appointment on May 23, 2018 with PA Cartabuke.  Tr. 372.  She was put on a BMI follow-up plan to help with weight loss.  Tr. 385.

4. <u>Treatment at NY Spine and Brain Surgery</u>

Plaintiff attended an appointment on December 22, 2015 at NY Spine and Brain Surgery with David Fiorella, MD ("Dr. Fiorella") after her hospitalization at Stony Brook University Hospital where she complained of headaches and associated dizziness.  Tr. 575.  She received a neurology referral for headaches and was told to follow up in five months for possible treatment of additional aneurysms.  Tr. 577.

Bonilla returned NY Spine and Brain Surgery on May 24, 2016 where she had an appointment to prepare for angiography to treat the remaining aneurysms.  Tr. 565.  She continued to have a left ICA aneurism that needed embolization.  *Id*.

Plaintiff underwent the angiography procedure on June 20 and had a post-operation appointment with Dr. Fiorella on June 28, 2016 where she was continued on Plavix, restarted on baby aspirin and scheduled for another cerebral angiogram in one year. Tr. 557-59.

Bonilla attended the one-year follow-up appointment from her angiogram on June 7, 2017. Tr. 524. She reported no dizziness or headaches, and Dr. Fiorella ordered a subsequent angiogram for her untreated aneurysms. Tr. 526. Bonilla underwent another cerebral angiogram on June 15, 2017, which showed complete occlusion of the right carotid ophthalmic segment aneurysm, and no change in size of the small left carotid ophthalmic segment aneurysm. Tr. 517. On July 18, 2017, Dr. Fiorella examined Bonilla for a follow-up of the angiogram where she complained of back and leg pain. Tr. 517. She was continued on aspirin daily and scheduled a follow-up in six months. Tr. 519-20.

On November 29, 2017, Plaintiff saw Daniel Birk, MD ("Dr. Birk") at NY Spine and Brain Surgery to review her MRI images ordered by Dr. Azaz at Mid Suffolk Medical Care and for her back and leg pain. Tr. 511. She reported losing balance and walked using a cane for ambulation and numbness in her toes. Tr. 512. On examination, Plaintiff showed full motor strength at 5/5 in the upper and lower extremities. *Id.* Her gait and station were stable. *Id.* Dr. Birk went over Bonilla's MRI results noting that the thoracic spine showed diffuse spondylosis with disc bulges and T2 signal abnormality in the T12, and the lumbar spine showed diffuse spondylosis with mild neural foraminal stenosis at L5 to S1. Tr. 512-13. He did not

recommend surgery and instead referred her for epidural steroid injections. Tr. 512. He counseled Plaintiff on weight loss because "her obesity is significantly contributing to her pain." Tr. 512.

On December 6, 2017, Bonilla saw Donald Macron, MD ("Dr. Macron") at NY Spine and Brain Surgery for a physiatry consultation due to her low back and leg pain. Tr. 501. She explained her symptoms were worse with walking and better when lying down. *Id*. Her musculoskeletal exam showed an antalgic gait, and she walked with a cane. Tr. 504. Bonilla demonstrated pain behaviors, such as catastrophizing thought and inconsistent tenderness to superficial palpitation. *Id*. Dr. Macron diagnosed mild degenerative disc changes at L5-S1, which did not account for Plaintiff's symptoms, and mild to moderate foraminal stenosis, but without overt compression of the nerve roots. Tr. 505. He could not easily explain Bonilla's symptoms from "modest and age-appropriate spinal changes." Tr. 506. Dr. Macron was concerned that Plaintiff's symptoms were not related to spinal changes and reported that "it would be reasonable to consider further evaluation for non-spinal sources . . . ." *Id*. No surgical intervention was warranted, and he could not recommend injections for low back pain based on the MRI results and because Bonilla had diabetes. *Id*. He recommended consultation with a pain management practitioner and follow-up treatment with Drs. Fiorella and Birk. *Id*.

On February 23, 2018, Plaintiff saw Dr. Fiorella and continued to complain of diffuse low back pain. Tr. 494. She took extra strength Tylenol and reported burning on the top of her head that came and went. Tr. 494, 496. On examination, she showed

full strength at 5/5 in all extremities.  Tr. 496.  Dr. Fiorella recommended monitoring Plaintiff with an MRA in one year.  Tr. 497.

### 5. Treatment at Long Island Medical Arts PLLC

On April 13, 2016, Plaintiff saw neurologist Ahmed Elfiky, M.D. ("Dr. Elfiky") at Long Island Medical Arts and underwent an EMG nerve conduction study.  Tr. 482-85.  It showed no evidence of lumbar or cervical radiculopathy or electrical instability in all examined muscles.  Tr. 483.  On June 15, 2016, Plaintiff saw Dr. Elfiky with complaints of severe headaches dizziness, fogginess, depression, difficulty sleeping and bilateral hand, foot and leg numbness.  Tr. 480.  She underwent a neurological exam, and Dr. Elfiky found moderate limited range of motion of the cervical spine with associated muscle spasms from C2 to C7, a positive straight leg raising at 45 degrees bilaterally, and associated muscle spasms from the L2 to S1 level and generalized weakness.  *Id*.  He continued her Topamax and scheduled an EEG.  Tr. 481.

In a letter dated August 26, 2016, Dr. Elfiky stated that he had treated Plaintiff since March 2016, and her diagnoses included multiple cerebral aneurysms, chronic daily headaches, cervical lumber radiculopathy, diabetes mellitus, depression and anxiety.  Tr. 293.  He reported Plaintiff had permanent/marked disability due to neurological and medical conditions and could not perform "any type of gainful employment."  *Id*.

On September 21, 2016, Plaintiff had a follow-up appointment with Dr. Elfiky, where she complained of headaches with associated dizziness and fogginess,

depressed mood, difficulty sleeping and intermittent hand, foot, leg and right-sided facial numbness. Tr. 478. Dr. Elfiky noted moderate limitation of range of motion in the cervical spine and associated muscle spasms, generalized weakness in all four extremities, a positive Tinel's test and non-specific hypoesthesia in the arms and legs. Tr. 478-79. He recommended increasing Bonilla's dosage of Neurontin to address chronic pain and continued use of Topamax. Tr. 479.

On November 23, 2016, Plaintiff returned to Dr. Elfiky with the same complaints as her prior appointment. Tr. 476. He noted a moderate restriction of the cervical spine with associated muscle spasms. *Id.* Straight leg raising was positive at 50 degrees with associated muscle spasms, and she had weakness in the bilateral upper and lower extremities. *Id.* Tinel's test was positive, and Bonilla had patchy areas of hypoesthesia in the arms and legs. Tr. 476-77. She was continued on her prior medication and started on Seroquel to help with insomnia and depression. Tr. 477.

On January 21, 2017, Plaintiff returned to Long Island Medical Arts to see Magda Fahmy, MD, PM&R, with complaints of neck pain and spasms, tightness radiating to the upper extremities and lower back pain radiating to the legs and associated weakness. Tr. 474. Plaintiff underwent an EMG and nerve conduction study, which showed evidence of bilateral L5 to S1 radiculopathy. Tr. 490-91. She was continued on her medications and started on physical therapy for her neck and back. Tr. at 475. Bonilla returned to see Dr. Elfiky on March 13, 2017 for a follow-up neurological evaluation. Tr. 469. She still complained of daily headaches,

radicular neck pain that radiated to her bilateral upper extremities, numbness in the right side of her face and hands, as well as lower back pain. *Id.* She was continued on physical therapy and Topamax. Tr. 470.

Bonilla had a follow-up appointment with Dr. Elfiky on May 17, 2017 for her headaches, right-sided facial numbness, neck pain radiating to the bilateral upper extremities, bilateral foot numbness and tingling, and lower back pain radiating to the bilateral lower extremities and associated muscle spasms, weakness and numbness. Tr. 467. He found limited range of movement of the cervical spine bilaterally associated with muscle spasms from C2 to C7, positive SLR 60 degrees bilaterally associated with muscle spasms from L2 to S1, and weakness of the bilateral deltoids, biceps, triceps, brachioradialis and hand grasp. Tr. 468. Bonilla had a limp on ambulation. *Id.* Dr. Elfiky prescribed Neurontin and Topamax. *Id.*

Plaintiff saw Dr. Elfiky again on July 12, 2017. Tr. 464. She had similar complaints noting worsening neck pain and severe mid-back pain and that her MRI of the thoracic spine revealed a tumor. *Id.* Bonilla said she felt depressed but that her headaches were lessened on Topamax. Tr. 464. On examination, Plaintiff's gait showed she limped on ambulation and used a cane. Tr. 466. An EMG study of the upper and lower extremities showed no evidence of cervical lumbar radiculopathy. Tr. 486-87.

Bonilla returned to Dr. Elfiky on October 11, 2017 where she sought to have her Topamax prescription refilled and her anti-depressant medication changed. Tr. 462. Plaintiff underwent a general physical and neurological exam, and Dr. Elfiky

noted she was using a cane for assistance on ambulation, and cerebellar examination was positive for sensory ataxia. *Id*. He changed her medication from Paxil for Prozac and recommended a psychiatric evaluation if the medication did not help. Tr. 463.

Plaintiff saw Dr. Elfiky for a follow-up appointment on January 3, 2018, and he ordered follow-up EMG nerve conduction studies of the upper and lower extremities. Tr. 460-61. He also continued Bonilla on Paxil and Topamax. *Id*. On March 14, 2018, Dr. Elfiky saw Plaintiff for her follow-up neurological evaluation. Tr. 446. On examination, he noted that there was mild to moderate limited range of motion of the cervical spine with associated paravertebral muscle spasm from the C2 to C7 level. Tr. 447. There was weakness in her deltoid, biceps and brachioradialis. *Id*. Straight leg raises were positive and associated with muscle spasm from the L2 to S1 level, and she showed some weakness in the hips and legs with flexion and extension. *Id*. Bonilla used a cane for assistance with ambulation. *Id*. She took Neurontin for long-term pain management, as well as aspirin and Topamax, and she received an epidural steroid injection to promote and expedite recovery. Tr. 448-49. An EMG/NCV study revealed nerve root irritation of the paraspinal muscles, and Dr. Elfiky reported that Plaintiff had a permanent marked disability and could not perform "any type of gainful employment." Tr. 448.

On July 18, 2018, Bonilla returned to Dr. Elfiky where she complained of headaches, but reported that they were managed on Topamax. Tr. 451. Plaintiff asserted the lumbar steroid injection helped 50 to 60 percent but was experiencing worsening symptoms and having difficulty standing or walking over 10 to 15 minutes

due to pain. *Id*. She received another steroid injection, and the examination findings were similar to her prior appointments. Tr. 453. Dr. Elfiky advised again that Bonilla was permanently disabled and not able to pursue any type of gainful employment. *Id*.

### 6. Consultative Medical Evidence

At the request of the SSA, Bonilla underwent two medical consultations on November 15, 2016: a psychiatric consultation with Dr. Herman and an internal medicine exam with Dr. Pollack.

#### a. Dr. Herman

On November 15, 2016, Dr. Herman at Industrial Medicine Associates conducted a psychiatric evaluation of Plaintiff at request of the SSA. Tr. 274-78. He reported Bonilla's history of migraine headaches, back and leg pain, multiple brain aneurysms, asthma and obesity. Tr. 275. Plaintiff complained of difficulty falling asleep and gaining weight, and that she felt sad and down due to her headaches and back pain that interfered with her functioning and quality of life. *Id*. Dr. Herman found that Bonilla was cooperative with adequate social skills. Tr. 276. She appeared adequately groomed, and she had no abnormalities in posture, motor behavior or eye contact. *Id*. Her intelligibility, quality of voice and language were all within normal limits. *Id*. Plaintiff's thought process was coherent and goal directed with no evidence of hallucinations, delusions or paranoia, and her mood was neutral. *Id*. Her attention and concentration were somewhat below average where she could perform simple calculations but could not perform certain number patterns. *Id*. Her

immediate recall was also below average, but her remote memory skills and cognitive functioning were intact. *Id*.

Bonilla reported no significant effects on her daily activities related to psychological or psychiatric issues. Tr. 277. She claimed her medical issues interfered in this area, which was beyond the scope of that evaluation. *Id*. She had hobbies, and she got along with friends and family and could help maintain the household and care for her children. *Id*. Accordingly, Dr. Herman reported no psychiatric diagnosis.

### b. Dr. Andrea Pollack

Also on November 15, 2016, Dr. Pollack at Industrial Medicine Associates completed an internal medicine exam of Bonilla at the request of the SSA. Tr. 280-83. Plaintiff reported she had asthma and used an inhaler and nebulizer twice a day, and she had a history of a cerebral aneurysms diagnosed in 2015 that required "clipping." *Id*. She had headaches daily, usually on one side, that could be from the front to the back of the head or migratory, but otherwise had difficulty describing them. *Id*. Bonilla reported sensitivity to sound, light and nausea lasting for an hour with use of medication as well as memory impairment. *Id*. She experienced back pain during the past five years that "comes and goes," and had a "stabbing" pain that radiated into the legs with numbness and tingling, and which Plaintiff rated at 8 out of 10. Tr. 280. She was taking Topiramate 50 mg and Gabapentin 300 mg twice a day, Albuterol as needed, Acetaminophen, aspirin and cinnamon. *Id*. Plaintiff

reported that she could cook, clean, shop and do laundry once a week.  Tr. 281.  She could shower and dress, and she read and socialized with friends.  *Id*.

On examination, Bonilla was 62 inches tall and weighed 292 pounds, which Dr. Pollack characterized as morbidly obese.  Tr. 281.  Bonilla walked with a slight limp, her stance was normal, and she did not use an assistive device.  *Id*.  She could squat a quarter of the way down, and Plaintiff did not need help changing for the exam, getting on or off the exam table or rising from a chair.  *Id*.  Dr. Pollack reported that Plaintiff had some reduced range of motion in the cervical and lumbar spine where cervical and lateral flexion were limited to 25 degrees, and flexion of the lumbar spine was limited to 45 degrees.  Tr. 282.  She showed full extension, but lateral flection of the lumbar spine was limited to 15 degrees bilaterally.  *Id*.  Straight leg raising was negative.  *Id*.  Forward elevation of the shoulders was performed to 130 degrees and adduction to 20 degrees, and internal rotation was performed to 30 degrees and external rotation to 60 degrees.  *Id*.  Plaintiff had a full range of motion of the elbows, forearms and wrists.  *Id*.  Hip flexion was performed to 80 degrees, and knee flection was performed to 130 degrees.  *Id*. Deep tendon reflexes were physiological and equal, and strength was 5/5 in the upper and lower extremities.  *Id*.

Dr. Pollack diagnosed Bonilla with asthma, a history of cerebral aneurysm status post repair, headaches, and neck and back pain with radiation.  Tr. 283.  Dr. Pollack opined that Plaintiff had:  (1) a mild restriction in reaching, walking, standing and sitting; (2) a moderate restriction in bending and climbing; and (3) a marked restriction in lifting, carrying, pushing, pulling and squatting.  *Id*.  Bonilla had to

avoid smoke, dust, and known respiratory irritants, heights, operating heavy machinery and activities requiring heavy exertion or that could put her at risk for a fall. *Id.*

### C. Procedural History

#### 1. Plaintiff's Initial Application for Disability Benefits

Plaintiff filed a Title II application for Social Security Disability Benefits on September 30, 2016 alleging disability as of November 1, 2015 due to depression, numbness, tingling in her face, hands, foot and legs, multiple cerebral aneurysms, diabetes, asthma and neck and lower back pain. Tr. 153-55, 175.

On November 1, 2016, Plaintiff completed a function report. Tr. 183-93, 203. Bonilla asserted that on a typical day she made breakfast, took her medication, showered and attended her doctors' appointments. Tr. 183. She had no problems with personal care, but she got nervous showering when her husband was not home because it was hard for her to lift her legs out of the tub. Tr. 184. She also reported problems falling asleep. *Id.* Her household chores included doing laundry and cooking daily meals such as soup, rice, salad and sandwiches for her family. Tr. 185. Plaintiff used to be able to ride a bike and play sports with her kids, but since the onset of her conditions, she got tired and fatigued quickly. Tr. 184-85. She needed help with cleaning and lifting heavy objects because of the pain in her hands, back, and legs, and she would sometimes lose her balance. Tr. 186. Bonilla would go outside two or three times a week depending on her doctors' appointments and could drive a car alone. *Id.* She shopped for food every week for an hour, and could pay

bills and handle money.  Tr. 186-187.  Plaintiff's hobbies included reading and listening to music, which she did every week, and since the onset of her conditions, she would get tired when listening to music.  Tr. 187.  On weekends, Bonilla talked with relatives who came to visit, and she attended church.  *Id*.  She no longer would dance because she was afraid to fall, and she sometimes did not attend family parties when she did not feel well.  Tr. 187.

Plaintiff reported issues with lifting, standing, walking, sitting, climbing stairs, kneeling, squatting, reaching and using her hands although she did not provide any specific information in the report.  Tr. 188.  She could walk about a half block before she had to stop and rest for five minutes.  Tr. 189.  Bonilla had no problems paying attention and following instructions of authority figures, but she reported getting angry for no reason when dealing with stress or changes in schedule.  Tr. 190.

Regarding her pain, Plaintiff reported that it began in November of 2015 and was affecting her activities more after her second surgery.  *Id*.  She described her pain as "burning, like when you burn your finger with hot oil," and that the pain is in her head.  Tr. 191.  She experienced pain daily, and it radiated to her back, arms, hands and legs and parts of her face get numb.  *Id*.  Her pain would start in the morning and would last all day unless she took her medication.  *Id*.  In May 2016, she began taking Topiramate and Gabapentin at morning and night, and Acetaminophen every four hours for her pain.  Tr. 191-92.  The side effects of her medication included urine incontinence and blood in her urine.  Tr. 192.

Plaintiff further reported that she suffers from depression and asthma. Tr. 192-93. She was depressed because she could not work at her prior job anymore. Tr. 192. Regarding her asthma, she used and inhaler twice a day or as needed and she also used a nebulizer. *Id.* Bonilla's asthma bothered her more in the wintertime or when she got close to people who smoke. Tr. 193. As of the date of the function report, she had not been treated by a doctor for asthma attacks or been hospitalized in the prior 12 months. Tr. 193.

### 2.  Denial of Plaintiff's Claim and Ensuing Administrative Hearing

By Notice of Disapproved Claim dated November 30, 2016, the Social Security Administration (the "SSA") denied Bonilla's claims. Tr. 81-92. She timely appealed by requesting a hearing before an Administrative Law Judge ("ALJ") on January 5, 2017. Tr. 93-95. Plaintiff had a hearing before ALJ Patrick Kilgannon ("ALJ Kilgannon" or "the ALJ") on October 16, 2018 where she appeared with counsel and testified. Tr. 41-64. At the hearing, Bonilla stated that she suffered a cerebral aneurysm in December 2015 and she stopped working. Tr. 47. Due to the aneurysm, she had headaches twice a day lasting 10 to 20 minutes at a time, which caused her to lay down up to two hours a day. Tr. 50-51. She took Topamax for headaches, which helped prevent them. Tr. 56. Plaintiff experienced neck pain daily that radiated to her arms and hands and complained of back pain associated with weakness in her legs and numbness in her feet. *Id.* She took Advil for the back pain and received several injections in her back. Tr. 55-56. She also suffered from depression. Tr. 56.

Bonilla further testified that she could sit for no more than ten minutes at a time due to back pain. Tr. 53. She could stand for about ten minutes at a time, after which she would experience leg pain. Tr. 53-54. Plaintiff could walk for up to 20 minutes before needing to rest for five minutes, and she used a cane because she had a history of falling due to leg weakness. Tr. 54. Bonilla could handle her own personal care, but her husband helped her put on shoes if he was home. Tr. 57. She could drive short distances alone although her husband would drive her longer distances. Tr. 58. She could cook but did not do housework. Tr. 58-59.

At the hearing, Frank Linder ("Linder"), a vocational expert, also testified. Tr. 60. Linder classified Bonilla's past work as a home attendant as a "medium exertion" position. *Id.* The ALJ posed numerous hypotheticals giving Linder a range of limitations. Tr. 60-62. When asked by the ALJ if there were jobs in the national economy that could be performed by a hypothetical individual of Plaintiff's age, education and work experience with a residual functional capacity ("RFC") of sedentary work with the following limitations: (i) ability to only lift up to ten pounds occasionally, (ii) sit six hours in an eight-hour workday, (iii) stand or walk two hours in an eight-hour workday with normal breaks, (iv) no climbing of ladders, ropes or scaffolds, (v) occasional climbing of ramps and stairs, (vi) occasional balancing, stooping, kneeling, crouching and crawling, (vii) frequent reaching bilaterally, and (viii) avoidance of irritants, poorly ventilated areas and hazards such as machinery and unprotected heights, Linder testified the Plaintiff's past work was eliminated, but there were other jobs that such a person could perform, like a callout operator

(5,240 jobs nationally), eyeglass frame polisher (10,890 jobs nationally) and document preparer (46,563 jobs nationally).  Tr. 60-61.  In addition, there was no postural limitation with these jobs.  Tr. 61-62.  When the ALJ asked if "lifting and carrying were limited to less than five pounds with sitting, standing, and walking restricted to less than eight hours per day," would preclude all employment, Linder responded affirmatively.  Tr. 62.

When Bonilla's counsel questioned Linder on whether the callout operator and document preparer positions required the individual to be fluent in English, Linder said yes and that there were no other sedentary jobs to replace them.  Tr. 63.  Bonilla's attorney had no further questions, and the hearing concluded shortly thereafter.  Tr. at 64.

### 3.  The ALJ's Decision

ALJ Kilgannon issued his decision on January 17, 2019 applying the five-step process described *infra*, pursuant to 20 C.F.R. § 404.1520.  Tr. 15-25.  At step one, the ALJ concluded that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of November 1, 2015.  Tr. 17.  At step two, he found that Plaintiff has severe impairments of s/p intracranial aneurysm, headaches, lumbar spine, morbid obesity and asthma significantly limiting her ability to perform the basic demands of work activity.  Tr. 17-18.  At step three, ALJ Kilgannon determined that Plaintiff's impairments, alone or combination, did not meet or medically equal the severity of any of the regulation's listed impairments, specifically for Listings: (i) 1.02 for anatomical deformity, chronic joint pain and stiffness, and limitation of motion,

(ii) 1.04 for herniated disc or compromise of the spinal cord or nerve root, (iii) 3.03 for asthma, or (iv) 11.18 for cerebral trauma.  Tr. 19-20.

The ALJ then addressed step four, considering Plaintiff's testimony and medical evidence.  Tr. 23-24.  An RFC determination identifies what work a claimant can still perform, despite her limitations.  *See* 20 C.F.R. § 404.1545.  Initially, the ALJ found that Plaintiff was unable to perform any past relevant work and that although Bonilla had a limited education, she was able to communicate in English.  Tr. 23.  The ALJ determined that Plaintiff had the RFC to perform sedentary work, as defined in 20 C.F.R. § 404.1567(a), except that: (1) she can never climb ladders, ropes or scaffolds; (2) she can occasionally balance, stoop, kneel, crouch and crawl; (3) she can frequently reach bilaterally; (4) she must avoid irritants such as fumes, odors, dusts, gases and poorly ventilated areas; and (5) she cannot work around unprotected heights or moving machinery.  Tr. 20.

In considering Plaintiff's limitations, ALJ Kilgannon followed a two-step process: (1) analyzing whether there was an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms; and if shown, (2) evaluating the intensity, persistence and effects of the symptoms to determine the extent to which they functionally limit the claimant.  *Id*.  The ALJ completed these steps by reviewing Plaintiff's testimony regarding her symptoms and the objective medical evidence.  Tr. 20-23.  The ALJ assessed Plaintiff's testimony regarding her symptoms including obesity, asthma, chronic headaches and migraines, numbness in her face, hands, legs

and feet, migraines with blurred vision and back pain radiating to her lower extremities.  Tr. at 21.  He gave "great weight" to Dr. Pollack's opinion but gave little weight to Dr. Elfiky's opinion determining that it "appears more sympathetic than objective."  Tr. 22.  ALJ Kilgannon concluded step four determining that Plaintiff was unable to perform any past relevant work because Plaintiff's previous work as a home attendant would require exertional effort more than her current capabilities.   Tr. 23.

Finally, ALJ Kilgannon relied on the testimony of the vocational expert to determine that, at step five, sedentary jobs exist in significant numbers in the national economy that Plaintiff can perform, including a call out operator, eye glass frame polisher or document preparer.  Tr. 24.  Accordingly, the ALJ found that Plaintiff was not under a disability as defined in the Social Security Act from November 1, 2015 through the date of his decision.  Tr. 25.

### 4.  The Current Action

ALJ Kilgannon's decision became final when the Appeals Council denied Plaintiff's request for review on December 10, 2019.  Tr. 1-3.  This appeal followed, and on February 13, 2020, Bonilla filed her Complaint against the Commissioner. *See* Compl.  The parties filed their motions for judgment on the pleadings on December 4, 2020.  *See* Pl. Mot.; Def. Mot.  For the reasons set forth below, the Court recommends:  (i) Plaintiff's Motion be granted, (ii) Defendant's Motion be denied, and (iii) the matter be remanded for further proceedings consistent with the reasoning below.

## II.   LEGAL STANDARD

## A. Motion for Judgment on the Pleadings

A motion for judgment on the pleadings should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." *Burns Int'l Sec. Servs., Inc. v. Int'l Union,* 47 F.3d 14, 16 (2d Cir. 1995). The Court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing a decision of the Commissioner of Social Security, with or without remanding the case for a rehearing." 42 U.S.C. § 405(g).

The Court's review of a Commissioner's denial of disability insurance benefits is limited to two inquiries: (1) whether the Commissioner applied the correct legal standards in reaching a decision, and (2) whether the Commissioner's factual findings were "supported by substantial evidence in the record as a whole." *Greek v. Colvin,* 802 F.3d 370, 374-75 (2d Cir. 2015); *see Selian v. Astrue,* 708 F.3d 409, 417 (2d Cir. 2013). The Court does not substitute its own judgment for that of the Commissioner's "or determine *de novo* whether [the claimant] is disabled." *Cage v. Comm'r of Soc. Sec.,* 692 F.3d 118, 122 (2d Cir. 2012); *see Greek,* 802 F.3d at 374-75 ("The ultimate determination of whether a person has a disability within the meaning of the Act belongs to the Commissioner.").

Inquiry into legal error requires the court to determine whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the [Social Security] Act." *Moran v. Astrue,* 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks and citation omitted). "Failure to apply the correct legal standard constitutes reversible error, including, in certain

circumstances, failure to adhere to the applicable regulations." *Kohler v. Astrue,* 546 F.3d 260, 265 (2d Cir. 2008) (citations omitted).

"To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Snell v. Apfel,* 177 F.3d 128, 132 (2d Cir. 1999) (internal quotation and citation omitted). Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian,* 708 F.3d at 417 (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971)) (internal quotation marks and citations omitted). Essentially, the findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive, *see* 42 U.S.C. § 405(g), and therefore, the relevant question is not whether substantial evidence supports plaintiff's position, but whether "substantial evidence supports *the ALJ's decision.*"  *Bonet ex rel. T.B. v. Colvin,* 523 F. App'x 58, 59 (2d Cir. 2013) (emphasis in original); *see also Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir. 1991) (holding that if the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, "even if [the court] might justifiably have reached a different result upon a *de novo* review").  This is a "highly deferential standard of review." *Negron v. Berryhill,* 733 F. App'x 1, 2 (2d Cir. 2018).

**B. Social Security Disability Standard**

To qualify for disability benefits under Title II of the Act an individual must be: (i) insured for disability benefits, (ii) not have attained retirement age, (iii) be a U.S. citizen or a foreign national under certain circumstances, and (iv) have a "disability." 42 U.S.C. § 423(a)(1). The Act defines "disability" to mean that a claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death[,] or which has lasted or can be expected to last for a continuous period not less than twelve months." 42 U.S.C. § 423(d)(1)(A); *see Cichocki v. Astrue,* 729 F.3d 172, 176 (2d Cir. 2013). The Act further states that the impairment must be "of such severity that [the claimant] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *see also Shaw v. Chater,* 221 F.3d 126, 131-32 (2d Cir. 2000).

The Social Security Administration has promulgated regulations prescribing a five-step sequential analysis to determine if a claimant is eligible for benefits based on a disability. *See* 20 C.F.R. §§ 404.1520; 416.920. The Second Circuit has summarized this evaluation process as follows:

- First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity;

- Second, if she is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits her physical or mental ability to do basic work activities;

- Third, if the claimant suffers such an impairment, the Commissioner evaluates whether, based solely on medical

evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider her disabled without considering vocational factors such as age, education and work experience;

- Fourth, assuming the claimant does not have a listed impairment, the Commissioner evaluates whether, despite the claimant's severe impairment, she has the RFC to perform her past work;

- Finally, if the claimant is unable to perform her past work, the Commissioner then determines whether there is other work which the claimant can perform.

*Talavera v. Astrue,* 697 F.3d 145, 151 (2d Cir. 2012) (citation omitted). The claimant bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at step five to show that the claimant is capable of working. *See Zacharopoulos v. Saul*, 516 F. Supp. 3d 211, 219-20 (E.D.N.Y. 2021).

## III. DISCUSSION

Bonilla argues the ALJ's RFC assessment is not supported by substantial evidence because it did not properly account for Plaintiff's migraine headaches and morbid obesity in step four of the analysis. *See* Pl.'s Mot. at 21-23. In addition, Bonilla argues that the ALJ Kilgannon should have sought clarification from Dr. Pollack because the RFC assessment for sedentary work is contradicted by her opinion regarding Plaintiff's "marked" limitations. Tr. 24. Although it is not entirely clear from her motion, this argument appears to challenge step five of the ALJ's analysis. Bonilla does not challenge the ALJ's decision as to steps one through three, and each argument regarding step four and step five is addressed separately.

28

### A. The ALJ's Analysis in Step Four Regarding Plaintiff's RFC Is Supported by Substantial Evidence.

Initially, Plaintiff argues that even though ALJ Kilgannon agreed that Bonilla's headaches qualified as a medically determinable impairment at step two of his evaluation, the ALJ's RFC assessment in step four does not account for limitations related to this condition. Pl. Mot. at 21. Plaintiff also argues that while ALJ Kilgannon did not dispute Plaintiff's impairment that she is morbidly obese, he did not consider its effect in combination with her other conditions when evaluating her disability. *Id.* at 22-24. In other words, Plaintiff argues that step four of the ALJ's analysis is not supported by substantial evidence.

An RFC determination specifies the "most [a claimant] can still do despite [her] limitations." *Barry v. Colvin*, 606 F. App'x 621, 622 n.1 (2d Cir. 2015) (summary order); *see Crocco v. Berryhill*, No 15-CV-6308, 2017 WL 1097082, at *15 (E.D.N.Y. Mar. 23, 2017) (stating that an RFC determination indicates the "nature and extent" of a claimant's physical limitations and capacity for work activity on a regular and continuing basis) (citing 20 C.F.R. § 404.1545(b)). In determining a claimant's RFC, "[t]he Commissioner must consider objective medical evidence, opinions of examining or treating physicians, subjective evidence submitted by the claimant, as well as the claimant's background, such as age, education, or work history." *Crocco*, 2017 WL 1097082, at *15; *see also Barry*, 606 F. App'x at 622 n.1 ("In assessing a claimant's RFC, an ALJ must consider 'all of the relevant medical and other evidence,' including a claimant's subjective complaints of pain.") (quoting 20 C.F.R. § 416.945(a)(3)). An RFC determination must be affirmed on appeal where it is supported by substantial

evidence in the record. *Barry*, 606 F. App'x at 622 n.1. Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lucas v. Berryhill*, 689 F. App'x 4, 5 (2d Cir. 2017) (internal citation and quotation omitted). To show that the Commissioner cannot satisfy the low threshold for "substantial evidence" set forth by the Supreme Court in *Biestek v. Berryhill*, U.S. __, 139 S. Ct. 1148, 1154 (2019), a claimant must show that no reasonable factfinder could have reached the ALJ's conclusions based on the evidence in the record. *See Brault v. Comm'r of Soc. Sec.*, 683 F.3d 443, 448 (2d Cir. 2012); *see also Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (reviewing court must afford the Commissioner's determination considerable deference and cannot substitute its own judgment even if it might justifiably have reached a different result upon a *de novo* review).

Applying these standards, the Court concludes that the ALJ properly accounted for Plaintiff's migraine headaches and morbid obesity in his RFC determination at step four. Regarding Plaintiff's headaches, ALJ Kilgannon cited to treatment notes with Dr. Elfiky regarding chronic migraine headaches and noted that "she has headaches twice per day that last 10-20 minutes. She must lay down when they strike." Tr. 21. Rather than negate their existence, as Plaintiff argues, *see* Pl. Mot. at 21, ALJ Kilgannon found inconsistencies in Bonilla's statements about the intensity, persistence and limiting effects of her headaches. *See* Tr. 22. The ALJ cited to her treating notes with Dr. Elfiky that indicate that her headaches respond well to Topamax, and with Dr. Fiorella who reported on March 5, 2018 that Bonilla

discontinued Plavix, was only taking baby aspirin, and did not complain of dizziness, numbness, tingling or headaches. *Id*. The ALJ's finding that Bonilla retained the capacity for limited sedentary work despite chronic headaches is supported by substantial evidence even if, as Plaintiff argues, ALJ Kilgannon does not address all evidence of cerebral aneurysms and ongoing medication management with Topiramate by Dr. Elfiky. Pl. Mot. at 22; *see Bonet ex rel. T.B.*, 523 F. App'x at 59 (citing *Brault*, 683 F.3d at 448) (An ALJ does not have to state on the record every reason justifying a decision, nor is he required to discuss every piece of evidence submitted.). In this case, the ALJ "weigh[ed] the conflicting evidence in the record" in reaching his conclusion. *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998); *Richardson v. Perales*, 402 U.S. 389, 399, 91 S. Ct. 1420, 1426 (1971) ("We therefore are presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict"); *see also Cage*, 692 F.3d at 122 ("In our review, we defer to the Commissioner's resolution of conflicting evidence"). Accordingly, there is substantial evidence to conclude that Plaintiff has the RFC to complete sedentary work with limitations despite chronic migraine headaches.

The same is true for Plaintiff's argument that ALJ Kilgannon did not consider Plaintiff's impairment that she is morbidly obese and its aggravating effects at step four of the analysis. *See* Pl. Mot. at 22-23. The ALJ noted that Bonilla is morbidly obese and that she "suffers from related conditions including hypertension and borderline diabetes mellitus" citing to her treatment records at Mid Suffolk Medical

Care.  Tr. 21.  ALJ Kilgannon also cited to Dr. Birk's treatment notes stating "her obesity is significantly contributing to her pain" and other treatment notes by doctors advising her to lose weight.  Tr. 22.  Despite this evidence, the ALJ found inconsistencies with Plaintiff's testimony and "statements by other doctors of there being no objective evidence to support claimant's complaints of severe back pain" and only "'mild' degenerative disc disease with nothing to account for claimant's symptoms and complaints."  Tr. 22.  While true that Dr. Birk's comment demonstrates that Bonilla's morbid obesity could account for her back pain, Pl. Mot. at 23, the ALJ concluded that her symptoms were not consistent and "far in excess of what would reasonably be expected from the objective medical evidence."  Tr. 21-22.  Moreover, Plaintiff has failed to put forth any additional evidence that would lead the Court to determine that no other reasonable factfinder could have reached the same conclusion as the ALJ regarding Plaintiff's RFC to perform limited sedentary work despite her obesity.

In reaching this conclusion, the Court acknowledges Plaintiff's argument that under SSR 02-01p, ALJ Kilgannon was required to consider her morbid obesity's aggravating effects on her other impairments, such as her back pain.  Pl. Mot. at 23. This, however, is a policy interpretation ruling of the SSA, and the ALJ did, in fact, list Plaintiff's morbid obesity as a severe impairment under step two of his analysis, *see* Tr. 17, and still found in step four that despite Dr. Birk's comment regarding Plaintiff's obesity, Bonilla's inconsistent testimony regarding her back pain alone or in conjunction with her other impairments did not establish "symptoms so severe that

all substantial gainful activity is precluded." Tr. 22.  Because the ALJ weighed the evidence and set forth, in detail, the reasons for his finding, the Court recommends finding that the ALJ's determination at step four that Plaintiff retained the RFC for limited sedentary work is supported by substantial evidence.

### B. The ALJ Failed to Develop the Record on Dr. Pollack's Opinion Erring in Step Five of the Analysis.

Finally, Plaintiff argues that although ALJ Kilgannon gave Dr. Pollack's opinion "great weight," his RFC assessment for sedentary work is contradicted, and the ALJ should have developed the record by clarifying with Dr. Pollack what a "marked limitation" meant.  Pl. Mot. at 24-25.  The Court agrees.

As set forth above, in the five-step inquiry for evaluating disability claims, the applicant bears the burden of proof in the first four steps, while the Commissioner bears the burden in the last.  *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). The final step requires the Commissioner to determine whether there is other work in the national economy in which the claimant could perform.  *Id*.  To determine the physical exertion requirements of work in the national economy, the SSA classifies jobs as "sedentary, light, medium, heavy, and very heavy."  20 C.F.R. § 404.1567. "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools.  Although a sedentary job involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally."  20 C.F.R. § 404.1567(a).  "If a plaintiff cannot perform work falling within the definition of sedentary for more than a brief period, the claimant

cannot be found not disabled." *Harvey v. Sullivan*, No. 85 CV 0042, 1990 WL 109218, at *2 (E.D.N.Y. July 24, 1990) (quoting *Rousey v. Heckler*, 771 F.2d 1065 (7th Cir.1985); *Cavitt v. Schweiker*, 704 F.2d 1193 (10th Cir.1983)).

Applying these standards, the Court concludes that the ALJ erred in failing to develop the record further regarding Dr. Pollack's medical opinion as to Bonilla's "marked limitations" in lifting, carrying, pushing, pulling and squatting, and without further clarification, the Commission failed to meet its burden at step five. Although Dr. Pollack concluded that Bonilla had "marked limitations," she failed to opine on a specific weight limit regarding these limitations, and ALJ Kilgannon gave this opinion great weight in his RFC assessment of Plaintiff's ability to perform sedentary work with certain exceptions. Tr. 22. At the hearing, when the ALJ posed the hypothetical whether there were jobs in the national economy that could be performed by an individual of Plaintiff's age, education and work experience with an RFC of sedentary work with the ability to only *lift up to ten pounds* occasionally, among several other limitations, the vocational expert testified that the Plaintiff's past work was eliminated, but there were other jobs that such a person could perform, like a callout operator (5,240 jobs nationally), eyeglass frame polisher (10,890 jobs nationally) and document preparer (46,563 jobs nationally). Tr. 60-61 (emphasis added). Nevertheless, the vocational expert further testified that where "lifting and carrying were limited to *less than five pounds* with sitting, standing, and walking restricted to less than eight hours per day" all employment opportunities would be precluded. Tr. 62 (emphasis added). It follows that if Dr. Pollack's "marked

34

limitation" means that Plaintiff cannot occasionally lift or carry five pounds or more, then there would be no work Bonilla could perform in the national economy, thereby rendering her disabled.  As a result, Bonilla would not be able to perform sedentary work under the SSA regulations, which involves lifting up to 10 pounds at a time. *See* 20 C.F.R. § 404.1567(a).  Accordingly, without clarification of Dr. Pollack's medical opinion, the Commissioner failed to carry his burden in step five, and the Court recommends remanding this matter for further proceedings on this issue.

### C. Remand of Plaintiff's Appeal

Federal regulations explicitly authorize a court reviewing decisions of the Commissioner to order further proceedings when appropriate.  42 U.S.C. § 405(g) ("The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.").  "[W]here the administrative record contains gaps, remand to the Commissioner for further development of the evidence is appropriate."  *Butts v. Barnhart*, 388 F.3d 377, 385 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005).  "That is, when 'further findings would so plainly help to assure the proper disposition of [the] claim,'" remand is particularly appropriate.  *Id.* (quoting *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999)); *see also Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).  This is generally the case if there are gaps in the administrative record or if the ALJ has applied an improper legal standard.  *See Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980).  In such cases, the Court will remand the case for further development of the

evidence. *Id.*; *see also Collins v. Comm'r of Soc. Sec.*, No. 20-cv-4693, 2021 WL 3054964, at *5 (E.D.N.Y. July 20, 2021).

Here, remand for further development of the evidentiary record is appropriate because the ALJ failed to clarify the medical opinion of Dr. Pollack, which he gave "great weight" in reaching the determination that Plaintiff has RFC to perform sedentary work with exceptions. *See* Tr. 22. This affected the vocational expert's testimony at Plaintiff's administrative hearing concerning job availability for an individual with her RFC, thereby reaching a premature conclusion at step five. For this reason, the Court recommends: (1) vacating the ALJ's decision as to step five; and (2) remanding Bonilla's appeal for further proceedings consistent with this Report and Recommendation.

## IV.    CONCLUSION

For the foregoing reasons, the Court recommends (i) Plaintiff's Motion be granted, (ii) Defendant's Motion be denied, and (iii) the matter be remanded for further proceedings with instructions to conduct a new analysis.

## V.    OBJECTIONS

A copy of this Report and Recommendation is being served on the parties by electronic filing on the date below. Any objections to this Report and Recommendation must be filed with the Clerk of the Court within 14 days. *See* 28 U.S.C. §636 (b)(1); Fed. R. Civ. P. 72; Fed. R. Civ. P. 6(a) and 6(d). Failure to file objections within this period waives the right to appeal the District Court's Order. *See Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.,* 596 F.3d 84, 92 (2d Cir. 2010); *Ferrer v. Woliver,* No. 05-3696, 2008 WL

4951035, at *2 (2d Cir. Nov. 20, 2008); *Cephas v. Nash,* 328 F.3d 98, 107 (2d Cir. 2003).

Dated:      Central Islip, New York
            January 28, 2022                    /s/ Steven I. Locke
                                                STEVEN I. LOCKE
                                                United States Magistrate Judge